**UNITED STATES v. 11 ACRES OF LAND, MORE OR LESS, IN PORT WASHINGTON, NASSAU COUNTY, N. Y., et al.**

No. 10.

District Court, E. D. New York.

Feb. 10, 1944.

Harry T. Dolan, Sp. Asst. to the Atty. Gen. (John A. Jordan, of Brooklyn, N. Y., Sp. Atty., of counsel), for petitioner-plaintiff.

Root, Clark, Buckner & Ballantine, of New York City (Charles C. MacLean Jr., and William J. Butler, both of New York City, of counsel), for defendant Pan American Airways, Inc.

90

CAMPBELL, District Judge.

This is a condemnation proceeding instituted by the United States of America on October 31st, 1942, for the purpose of acquiring approximately 11 acres of land, as improved on March 31st, 1942. Title to said property vested in the United States on October 31st, 1942, but the value of the property is to be established based upon its physical condition as of the date the Government went into possession, that is, March 31st, 1942. The property has been variously estimated by the witnesses to comprise 10.9 acres, 11 acres and 11.05 acres erroneously stated to be 11.8 acres. I will consider that the property comprises 11 acres as described in the petition herein.

This property is located on Manhasset Isle, so-called, in the Village of Hanorhaven, Town of North Hempstead, County of Nassau.

The property is distant about 20 to 22 miles from Central New York City, 2 miles from the Long Island Railroad station serving this community, and one and one-half miles from Port Washington. Manhasset Isle comprises 80.05 acres, of which 36 acres have been zoned since 1930 for industrial use, and the remainder for residential use. Approximately thirty buildings had been built in the residential area, and these were in the $2,000 to $4,000 class. The land is surrounded on three sides by the waters of Manhasset Bay. In the industrial area, which comprises, with the exception of the subject property, approximately 24 acres of upland and 22 acres of land under water, which could be filled to the bulkhead line, and all of which upland was solid dry land with the exception of approximately 2 acres, there were and still are but two industrial activities—a small boatyard rented from the county for $25 per month, and a small bulk oil station. These two industrial activities occupy about one-half an acre of the entire undeveloped industrial area of 36 acres.

Except for these two minor industrial activities, and the activities of the former owners of the subject property, the entire industrial area of 36 acres has been entirely devoid of industrial development.

The improvements as they existed on the property on March 31st, 1942, when the Government took possession, were as follows:

North Hangar (referred to in these proceedings as Government Building No. 2 and Claimant's Building "C").

This building was of steel, brick and glass construction having the following dimensions: 130 feet wide by 312 feet long and 50 feet high, with a clearance of 40 feet to the trusses. A former garage building, converted to an administration building, adjoined the north hangar. This building was 68x112 and of brick and steel construction, with a clearance of 12 to 14 feet.

South Hangar (referred to in these proceedings as Government Building No. 1 and Claimant's Building "B").

This building was likewise of brick, steel and glass construction and was 130 feet wide by 400 feet long and had a height of 30 feet with a clearance of 22.6 feet under the trusses. To the South Hangar there was an extension, referred to in these proceedings as the "Dope House" or building "A". This building was of brick and steel construction, and was 60 feet wide by 200 feet long, with a clearance of 18 feet. There was a small addition to the "Dope House" measuring 33x20. There were also two small frame buildings measuring 20x20 feet which were not described by the claimant's witnesses, but included by the Government's witness in his description of the property. There was also a boiler house 50x82 south of the South Hangar, in which one boiler had been installed, and in which there was room for two additional boilers.

There was another proposed building, referred to in these proceedings as Building "D", which consisted merely of foundation and a steel skeleton. This building had never been completed, and the steel work was salvaged by the former owner and not taken by the Government in this proceeding.

The location of this steel frame work was to the east of the North and South Hangars, and it was contemplated that both the North and South Hangars would be joined thereto. The east wall of the South Hangar was of temporary construction, in bad condition, and was covered over with asbestos sheeting. The east wall of the North Hangar was likewise of temporary construction, but more durable type of construction. The west wall of the North Hangar was never enclosed, and remained

open at the time of taking by the Government.

There were some heating facilities and radiation in the South Hangar, and the extension thereto, but the heating equipment was not in operating condition, and had never been in use since the property was acquired by the Marine Airport Corporation in 1933. The valves, pipes and fittings had become cracked, and the boilers were not in serviceable condition. The land improvements consisted of a floating walkway, which was removable, and which I understand was removed by the former owner, as was the steel skeleton framework of the building hereinbefore referred to.

The property was enclosed by a steel fence 2,130 feet long, and there were three 25,000 gallon oil tanks buried in the ground to the southwest of the South Hangar. A wooden ramp had been constructed to the west of the South Hangar and a carpet ramp had been constructed to the west of the North and South Hangars. A small pier at the southerly end of the property had been constructed, as well as certain paving improvements consisting of concrete, macadam and other types of paving material. The property was served by a public water supply, but there was no sewerage disposal system serving the property. The water in Manhasset Bay opposite the property has a depth beginning at zero at the shore line, and reaching 6 feet at low tide, a distance of 100 feet from the shore line.

At the time the Government went into possession of this property the Gulf Refining Company was occupying, under lease, 52,000 square feet of space in the South Hangar and comprising the entire floor space. The annual rental at the time of the taking was $9,000, said rental having been reduced from a previous rental of $10,000 annually. This rental would be at the rate of 17.3 cents per square foot. The Columbia Aircraft Corporation was occupying approximately 15,000 square feet of space in the extension building to the South Hangar and paying therefor an annual rental of $3,200, or at the rate of approximately 22.5 cents per square foot. Both tenants provided their own heating facilities. The leases also included participation in the full use of the facilities of the property. The North Hangar was not under lease, and it does not appear that this space

had ever been rented as this building had never been completed, and the west wall had never been closed.

The areas of the various buildings hereinbefore referred to, as computed by the Government's witness, are as follows:

| | | |
|---|---|---|
| Building No. 1 (South Hanger) | 52,000 square feet | |
| Extension to Building No. 1 (Dope House) | 12,746 " " | |
| Building connecting South Hanger and Dope House | 3,355 " " | |
| Building No. 2 (North Hanger) | 43,956 " " | |
| Administration Building | 7,820 " " | |
| Boiler House | 4,644 " " | |
| Total rentable area | 124,521 " " | |

In addition to the areas above referred to, there were two small frame buildings, which had an area of 400 square feet each and were treated as service buildings and included in the valuation by the Government's witness.

This property was acquired by the American Aeronautical Corporation during the year 1929, and presents an impressive example of the effect of obsolescence and economic depreciation upon the value of the property.

During the year 1929 the American Aeronautical Corporation was organized and selected this site for the manufacture and assembly of seaplanes, based upon a design of Italian origin known as the Savola-Machetti.

The aviation industry is still in its infancy, and few, if any, industries have experienced such a rapid growth, and experienced such radical revolutionary changes in the art, design, construction and utility of the planes which are used in the industry and this is well shown in the buildings and utilities on the subject property.

From the testimony it appears that the buildings on this property were specially designed for use in the manufacturing and assembling of seaplanes having a wing span of 80 to 90 feet and for the necessary offices incident to the business, as well as a school for the training of the operators of such planes.

The construction of the improvements on this property by the American Aeronauti-

cal Corporation came to an end in January, 1930.

The land and buildings in their then state of construction passed into the ownership of the Lienholders Corporation in the year 1930, and was held by it until October 13th, 1933, when the land and improvements as they then existed were sold to the Marine Airport Corporation, a subsidiary of Pan American Airways, Inc., for the sum of $165,000.

During the years 1933, 1934, 1935 and 1936 the Marine Airport Corporation used the property as a private airport where space was rented to the public for the housing of small aircraft, and where the servicing, maintenance and repair of a multitude of small craft was conducted.

During the year 1937 Pan American began assembling the necessary personnel and equipment to conduct transatlantic commercial flying. That was the day of private airports, cities and municipalities had not then extended facilities at public expense for large scale commercial transportation by air. New York City it is true had, during the year 1935, acquired some land at North Beach for the purpose of constructing a municipal airport, which would serve both land and seaplane operations, and thereafter, during the ensuing years, constructed an airport known as the North Beach Airport (later known as La Guardia Field).

In 1937 Pan American having determined to attempt to adapt the subject property to its acute needs, the Marine Airport Corporation claims to have spent approximately $144,000 in an effort to adapt to its then, as I believe, from the work that was done and the work that remained undone, temporary needs.

During the month of November, 1937, the Pan American removed its terminal repair and maintenance facilities to Baltimore, Maryland. La Guardia Field was then under construction and Pan American had plans to make use of La Guardia Field. After the removal to Baltimore and during the year 1937 the Marine Airport Corporation leased the entire South Hangar comprising 52,000 square feet to the North Beach Airport Company. After the termination of the business of the North Beach Air Service, Inc., the same space was leased to the Gulf Oil Refining Company, which continued to occupy the space until the property was taken by the Government.

No substantial improvements were made after 1937.

La Guardia Field was opened for occupancy during the year 1940, and Pan American removed its terminal facilities to La Guardia Field during that year.

The evidence does not show that any transatlantic flights were made from the subject property in regular commercial service, but flights were made to Bermuda.

The lack of adaptability and suitability of this property, as a terminal for commercial transatlantic service, are clearly shown in the evidence, and do not require repetition here.

To furnish further facilities for air transportation, the City of New York has acquired 3,000 acres of land along the south shore of Long Island, and is constructing an air terminal for that purpose (Idlewild) and has appropriated $13,000,000 for that purpose.

Defendant contends that the subject property is of a specialty character which should be appraised at the fair market value of the land, and the cost of reproduction of the improvements thereon, less depreciation.

In this, it is in error.

It is true that such a rule prevails as to specialty property such as churches, schools, clubhouses, and in some cases public utility plants, but not to property of the character of the subject property. The only sense in which that is special property is that it was constructed specially for the use of the owner, but that is not the test, as it is not the special value to the owner or to the taker that fixes the value in a condemnation proceeding, the test being just compensation, which is ordinarily fair market value.

While reproduction cost, less depreciation, is to be considered, it would have but slight weight here due to the very large depreciation which should be figured for obsolescence, and economic depreciations.

The opinion of expert witnesses as to values, unless supported by sales, is of little assistance to the Court, and I find that in this case we do not have the assistance of the prices for which comparable improved property has been sold, and therefore the only fair method of determining just compensation in this case is by capitalization of actual or potential income. Of

course, land value has been ascertained by comparison.

█ The subject property was not suitable and adaptable for a commercial airport, no market or demand existed therefor.

The highest and best use for this property, and for which a market and demand existed, on the date of the taking, was the use to which the property was being put, that is, for the housing, maintenance, repair and fueling of surface and seaplane craft.

The attempted valuation of the subject property by capitalization of potential income for manufacturing purposes by defendant's witness, who fixed it at 37½ cents a square foot, is not supported by the conditions of the buildings, and improvements on the property, as compared with the conditions of the property with which he made his comparison. Further, that witness did not see the subject property on March 31st, 1942, and does not know what its condition really was at that time, and considerable changes have been made since the Government took possession.

I viewed the subject property before considering the award, but it was long after the Government had taken possession, and many changes in the way of improvements had been made after such taking of possession.

In my opinion plaintiff's expert has arrived by comparison at the value of the land and has pursued the proper method in his capitalization, except for the fact that he has rested too heavily on the rentals received for some portions of the property.

The rentals may properly be considered in checking the result I find, but I do not believe that we should average them and add ten per cent, on the contrary, I would pursue generally the method of plaintiff's expert, substituting what I believe the evidence fairly sustains, a rental value of 25 cents a square foot, and I find the value of the subject property taken, as follows:

| | | |
|---|---:|---:|
| Estimated Rental | | $ 31,131. |
| Taxes—Est. A.V. $220,000 | $6,204. | |
| Insurance—40¢ rate A.V. $300,000 | 1,200. | |
| Repairs & Maintenance as per breakdown | 1,366. | |
| Depreciation | 2,500. | |
| Reserve for Vacancies and contingencies including War Risk Reserve $360 , | 1,356. | 12,826. |
| | | 18,305. |
| Value (capitalized at 8%) | | 228,881. |
| Excess land 6 Acres | | 27,360. |
| | | $256,241. |
| Add: value Boiler & Heating Equip. | 12,000. | |
| 3 Tanks 25,000 gal. each | 3,000. | |
| | | 15,000. |
| Deduct: Repair Doors So. Hangar | 2,500. | |
| New Enclosure No. Hangar | 10,000. | |
| | | 12,500. |
| Result add differential | | 2,500. |
| Total value of Property for which I make this Award, which is distributed as follows: | | $258,741. |
| Land | 64,400. | |
| Improvements | 194,341. | |

Settle order on notice.